CONTAINER STEVEDORING AND SERVICE AGREEMENT

BETWEEN

YANG MING MARINE TRANSPORT CORPORATION

AND

TRANSBAY CONTAINER TERMINAL, INC.

OAKLAND, CALIFORNIA, USA

Original: Capt. Lee
cc: YML TPE/MOAT
Solar LOS
Solar LOSTML
NYC/Ben
NYC/Capt. Chiu
NYC/W.J.Lee
Solar SFO

January, 1996

TABLE OF CONTENTS

| | | |
|---|---|---|
| 1.0 | CONTRACTOR'S SERVICES AND OBLIGATIONS | 1 - 8 |
| 2.0 | CARRIER'S OBLIGATIONS | 8 - 10 |
| 3.0 | EXTRA WORK | 10 |
| 4.0 | LABOR STANDBY, DETENTION, AND DEADTIME | 11 |
| 5.0 | COMPENSATION | 11 - 12 |
| 6.0 | INDEMNITY | 12 - 13 |
| 7.0 | INSURANCE | 13 |
| 8.0 | INDEPENDENT CONTRACTOR | 14 |
| 9.0 | ASSIGNMENT | 14 |
| 10.0 | ARBITRATION | 14 |
| 11.0 | APPLICABLE LAW | 14 |
| 12.0 | FORCE MAJEURE | 14 |
| 13.0 | CONTAINMENT OF ENTIRE AGREEMENT HEREIN | 14 |
| 14.0 | ATTORNEY'S FEES AND COSTS | 15 |
| 15.0 | PARTIAL INVALIDITY | 15 |
| 16.0 | TERM OF THIS AGREEMENT | 15 |
| 17.0 | COMPLETION | 15 |
| 18.0 | MODIFICATIONS | 15 |
| 19.0 | NOTICES | 15 |
| | SCHEDULE OF RATES | Attachment |

## CONTAINER STEVEDORING AND SERVICE AGREEMENT

This CONTAINER STEVEDORING AND SERVICE AGREEMENT is made and entered into as of January 1, 1996, by and between YANG MING MARINE TRANSPORT CORPORATION, a corporation organized and existing under the laws of the Republic of China (hereinafter referred to as "CARRIER"), and TRANSBAY CONTAINER TERMINAL, INC., a corporation of the State of California (hereinafter referred to as "CONTRACTOR").

### 1.0 CONTRACTOR'S SERVICES AND OBLIGATIONS

#### 1.1 GENERAL

CONTRACTOR Shall:

A. Provide and perform at its marine terminal facility located in the Port of Oakland (hereinafter referred to as "TERMINAL"), container stevedoring and terminal services as hereinafter described, for CARRIER's full and empty 20', 40', and 45' sea freight containers loaded to or discharged from container vessels (with fitted lashing equipment) owned, chartered, or otherwise controlled by KAWASAKI KISEN KAISHA, LTD., a corporation organized and existing under the laws of Japan (hereinafter referred to as "OWNER") under the Space Charter and Operation Agreement between CARRIER and OWNER. CONTRACTOR will also provide and perform stevedoring work for CARRIER's non-containerized cargo loaded to or discharged from the above-mentioned container vessels.

B. Perform its services hereunder in an efficient, economical and workman-like manner.

C. Furnish adequate yard space as required for efficient vessel and terminal operations based on a decked yard operation.

D. Supply all necessary employees, labor, supervision, normal existing security watchman service, necessary electric power supply system, and necessary equipment based on I.S.O. standards.

E. Maintain the facility and equipment in sound condition, including container gantry cranes and transtainers.

F. Perform stevedoring services 24 hours a day and seven days a week in accordance with the ILWU/PMA Collective Bargaining Agreement and the customs and practices of the Port. Third shift work will be performed only if requested by OWNER.

G. Perform yard and gate services during the regular working hours on the day shift on Mondays through Fridays, exclusive of holidays. Yard and gate services outside the regular working hours may be performed if requested in writing by CARRIER and accepted by CONTRACTOR at CARRIER's expense.

H. Provide minimum and essential repair services at the TERMINAL for CARRIER's containers and chassis, including pre-trip inspection

   2. Set-up containers to be released to truckers and deck containers received from truckers, except those to be kept on-wheels per CONTRACTOR's operational requirements. CARRIER shall supply sufficient number of roadable chassis for containers to be released.

   3. Check temperatures of export (outbound) reefer containers received through the gate per the procedure mutually agreed upon. Plug or unplug reefer containers in the yard to/from the power supply system, monitor temperatures periodically, and report to CARRIER any discrepancies found as soon as practicable.

B. <u>Release of Local Delivery Containers</u>

   Local delivery containers will become available to pick up upon completion of discharge of all local delivery containers from the vessel.

C. <u>Release of Empty Containers</u>

   Empty containers will be decked for delivery to truckers or for loading to vessels by container type and size. CONTRACTOR will not release empty containers by container number for off-leasing or any other purpose.

D. <u>Live Reefer Containers, Hazardous Containers, Over-Dimension Containers, Late and Early Received Outbound Containers</u>

   Live reefer containers, containers with certain classes of hazardous materials, over-dimension containers, outbound containers received after cut-off and outbound containers received for other than the immediate vessel may be kept on-wheels in the TERMINAL per CONTRACTOR's operational requirements.

E. <u>In Yard Shifting/Rehandling</u>

   In the event any outbound container received at the TERMINAL is required to change loading vessel or destination at CARRIER's instruction, CONTRACTOR will shift or rehandle such container in the yard at CARRIER's expense.

F. <u>In-Yard Drayage of Containers and Bare Chassis</u>

   CONTRACTOR will perform in-yard drayage of containers, as well as, bare chassis for inspection, repair, etc., per CARRIER's request or per requirement of any government agency, at CARRIER's expense.

G. <u>Chassis Switch</u>

   Contractor will perform chassis switch upon request of trucker, including chassis switch due to the reasons of damaged chassis, shortage of genset chassis, or receiving outbound containers specified in Item D. of this Section on truckers' or shippers' owned chassis, at CARRIER's expense.



4.



H. Storage of Containers and Chassis

   Inbound and outbound full containers will be stored in the TERMINAL subject to the rates, rules and regulations of wharf demurrage, wharf storage and free time in Port of Oakland Tariff.

   CONTRACTOR will store CARRIER's empty containers with the volume ceiling agreed to by CONTRACTOR. Any excess volume on any given day may be stored in the TERMINAL subject to empty container storage charges provided in the Schedule of Rates of this Agreement.

   Damaged empty containers received at the TERMINAL from vessels or through the gate which will not be loaded to the immediate vessel shall be drayed out of the TERMINAL by CARRIER.

   CARRIER shall provide, and CONTRACTOR will store, sufficient numbers of roadable chassis for release of inbound full containers and empty containers, as well as, for CONTRACTOR's operational requirements. CARRIER shall not use TERMINAL for chassis storage, and in the event a substantial number of chassis in excess of above requirements are stored in the TERMINAL, CARRIER shall dray out such excess volume from the TERMINAL. Damaged chassis, excluding chassis with missing or burnt-out lights and flat tires, shall be immediately drayed out of the TERMINAL by CARRIER.

1.4 GATE ACTIVITY

   CONTRACTOR will:

   A. Receive full or empty containers on chassis, as well as, bare chassis at in-gates per CARRIER'S instructions. CONTRACTOR shall make a visual inspection of the containers and chassis and shall take exception notations for the damages or defects (found through such visual inspection) on the interchange receipt with the following criteria.

In case of containers, if such damage or defect affects:

   - Proper cargo worthiness (weather proofing).
   - Normal handling and transportation due to a decrease in structural strength or a deformation in excess of ISO external dimension tolerances.
   - Substantial decrease of the inside cubic volume due to a deformation.

In case of chassis:

   - Major structural damage or flat tire only.

Any other damage or defect not noted at in-gate is not to be considered the responsibility of CONTRACTOR.



5.



CONTRACTOR; however, will not receive following containers:

1. Overweight containers exceeding max-gross weight of the container as marked on the container.

2. Hazardous containers with the presence or release (including a threatened release) of hazardous substances inside and/or outside of the container in violation of any laws, statutes, ordinances, regulations, rules or other governmental requirements.

3. Hazardous containers without accompanying proper documentation mutually agreed upon.

4. Hazardous containers without proper placards, unless CONTRACTOR is authorized to affix placards at CARRIER's expense.

5. Flat rack or open side containers with the cargo not properly stowed and/or secured for trans-Pacific carriage.

6. Empty containers having any residue, dirt, dunnage and/or odor inside the container, and/or placards for hazardous material remaining on the container, unless CONTRACTOR is authorized to clean inside of the container and/or remove placards for hazardous material at CARRIER's expense.

CONTRACTOR will not receive outbound containers prior to commencement of free time for the applicable vessel per rules and regulations of the Port of Oakland Tariff.

All outbound containers, except a limited number of containers agreed to by CONTRACTOR, shall be received prior to the cut-off time, which is the end of the first shift on the weekday (Mondays through Fridays, exclusive of holidays) prior to the commencement of vessel loading operations. CARRIER shall inform CONTRACTOR of each container number (including ETA of each at the TERMINAL) of such a limited number of late receiving containers by the cut-off time. All late receiving containers shall be received by one-and-a-half shifts prior to the completion of vessel loading operations and shall be subject to the late receiving charge provided in the Schedule of Rates of this Agreement.

B. Release full or empty containers on chassis, as well as, bare chassis at out-gates per CARRIER's instructions.

Import (inbound) containers will only be released upon proper presentation of documentation by truck drivers and release authorization from CARRIER or its agent.

Empty containers to cover export bookings may be released from the TERMINAL.

Truckers are responsible to take exceptions on leaving the TERMINAL for damages or defects found to CARRIER's equipment and, if agreeable, CONTRACTOR will note on interchange receipt. Any damages or defects other than major structural damage caused by CONTRACTOR, whether noted or not noted by truckers on interchange, is not to be considered the responsibility of CONTRACTOR.

    C. Check seals and record seal numbers on loaded containers.

    D. Weigh all outbound full containers.

    E. In the event roadability check on CARRIER's chassis before leaving the TERMINAL is requested by CARRIER or becomes essential by regulation, CONTRACTOR will provide mechanics for said roadability check at CARRIER's expense.

    F. Receive or deliver non-containerized cargo at an area in the TERMINAL designated by CONTRACTOR. Unloading or loading cargo from/onto trucks shall be arranged by truckers, otherwise arranged by CONTRACTOR at CARRIER's expense.

Receiving/delivery charge to cover CONTRACTOR's clerk time and administration shall be assessed to CARRIER.

### 1.5 MAINTENANCE AND REPAIR OF CARRIER'S EQUIPMENT

CONTRACTOR will provide the following minimum and essential maintenance and repair services at the TERMINAL for CARRIER's equipment.

| | |
|---|---|
| Container: | - Temporary patch on hole in full inbound and outbound containers. |
| Reefer Container: | - Pre-trip inspection for reefer containers which are discharged from the vessels at the TERMINAL as empty. |
| Chassis: | - Replacement of missing, broken, or burnt out lights and lenses, not to include electrical trouble shooting.<br>- Replacement of flat tires. |

Unless otherwise agreed to between CARRIER and CONTRACTOR, CONTRACTOR will not provide any other maintenance and repair services at the TERMINAL and CARRIER shall dray out their damaged equipment from the TERMINAL.

### 1.6 DOCUMENTATION

The following documentation shall be prepared and processed by CONTRACTOR in the CONTRACTOR's form:

    A. Equipment Interchange Receipt (E.I.R.).

    B. Copies of CONTRACTOR's daily E.D.P. print-outs for gate transactions and daily inventory of containers and chassis (as information only).

    C. Dock receipts for non-containerized cargo.

    D. Other documents mutually agreed upon.




### 1.7 GANG ORDERING AND BERTHING OF VESSELS

A. CONTRACTOR will assign a berth as available upon the arrival of OWNER's container vessel and, unless otherwise agreed between CONTRACTOR and OWNER, to start vessel's operation at the commencement of the next 1st or 2nd shift succeeding the vessel's arrival at the TERMINAL.

B. CONTRACTOR shall, unless otherwise agreed, decide the number of gangs to order after consulting with OWNER in advance.

C. Labor gang(s) will be ordered by CONTRACTOR on the basis of the latest ETA given by OWNER before closing time to file/cancel labor gang orders for the anticipated working shift.

D. If requested by OWNER, CONTRACTOR will order gang for a vessel arriving after beginning of the work shift, providing OWNER is responsible for standby and deadtime after completion of vessel's operations.

E. CONTRACTOR will arrange gang(s) for 3rd shift upon request of OWNER. Any labor standby, detentions (except those caused by CONTRACTOR or his equipment), and deadtime shall be for account of OWNER.

F. CONTRACTOR shall obtain OWNER's prior approval to order extra labor to be for OWNER's account.

G. CONTRACTOR shall not be responsible for shortage of or inability to obtain labor gang(s) or labor.

### 2.0 CARRIER'S OBLIGATIONS

2.1 CARRIER shall provide CONTRACTOR all necessary information and instructions to allow CONTRACTOR to provide efficient service, such as:

A. Inbound:

1. Delivery Orders.

2. Reefer/dangerous cargo manifest.

3. Container movement order, or worksheet, or manifest.

4. Details of awkward containers and non-containerized cargo.

5. EDI "Intermodal Certification" information, if and when official regulations take effect.

B. Outbound:

1. Booking information, which shall be regularly updated. CARRIER and CONTRACTOR shall close-out all booking information at 1700 on the weekday (Mondays through Fridays, exclusive of holidays) prior to the day of cut-off.

TiR.  8

    2. Written instructions regarding dangerous cargo and reefer temperatures.

    3. Details of awkward containers and non-containerized cargo.

    4. Container numbers of late receiving containers with ETA at the TERMINAL.

C. General:

    1. OWNER shall advise CONTRACTOR of vessel schedules and ETA's at Oakland in advance and shall notify CONTRACTOR of changes as they occur in sufficient time in order that CONTRACTOR can properly plan yard and berthing space.

    2. CARRIER shall coordinate with CONTRACTOR information on delivery and receiving schedules in advance and shall maintain cut-off times in order to allow CONTRACTOR's preparation for container handling.

    3. CARRIER shall provide CONTRACTOR, well in advance, any other special instructions for yard and/or gate operations to enable CONTRACTOR to prepare its operation plan to comply with such instructions.

    4. CARRIER shall advise CONTRACTOR, in writing or in EDI transmission, of its owned and leased containers and chassis to be handled on the TERMINAL specifying numbers, types, and sizes of equipment.

CARRIER shall also immediately notify CONTRACTOR of containers and chassis to be taken on-lease and/or off-lease. Leased chassis shall be stickered with CARRIER's name before being sent to the TERMINAL.

    5. CARRIER shall provide CONTRACTOR, by confidential means, advanced written notification of:

    i. Cargo valued, per container, in excess of $500,000.
    ii. Any cargo consisting of:

        (1) Bullion or precious metal objects
        (2) Precious stones or precious jewelry
        (3) Bank notes or coins
        (4) Bonds or negotiable instruments or securities of any type
        (5) Valuable works of art
        (6) Bloodstocks

2.2 CARRIER shall establish EDI access to CONTRACTOR's computer system for transmitting Outbound booking information and releases of inbound containers, as well as receiving gate activity data.

Computer services beyond normal terminal operator's functions may be provided by CONTRACTOR at CARRIER's expense.




9

2.3 OWNER shall maintain its ship, gear, and equipment in a safe condition in full compliance with all the requirements of United States Public Law 85-742 and O.S.H.A. regulations.

2.4 When CARRIER's containers are brought into the TERMINAL on non-CARRIER's chassis, including unidentified chassis, CARRIER is to be fully responsible for their removal from the TERMINAL and any costs incurred, provided immediate notice is given to CARRIER by CONTRACTOR upon receipt.

2.5 Hazardous Substances

Hazardous substances, as used herein, shall mean any hazardous, toxic, dangerous, or extremely dangerous substance, material, or waste which is or becomes regulated by the United States Government, the State of California, or any local governmental authority. The term includes, without limitation, any substances containing constituents regulated as specified above.

CARRIER shall notify CONTRACTOR of any container with cargo containing any hazardous substances and shall be fully responsible for the proper and lawful transportation of the cargo.

In case of outbound containers, CONTRACTOR will make an effort to detect and reject receiving such containers with the presence or release (including a threatened release of hazardous substances), inside and/or outside of the container in violation of any laws, statutes, ordinances, regulations, rules, and other governmental requirements.

If and when CONTRACTOR detects any release of hazardous substances inside and/or outside of outbound containers after receipt at the TERMINAL, and/or inside and/or outside inbound containers discharged from the vessels, CONTRACTOR shall notify CARRIER and promptly take such action as is necessary and possible by CONTRACTOR to mitigate and correct the violation, which will be at CARRIER's expense unless such release of hazardous substances is caused by sole negligence of CONTRACTOR.

CARRIER shall be fully responsible for the treatment and disposal of such containers and hazardous substances, and shall indemnify and hold CONTRACTOR harmless from all liabilities, expenses, loss, or claim resulting from the release and/or disposal of hazardous substances, unless such release of hazardous substances is caused by sole negligence of CONTRACTOR.

3.0   EXTRA WORK

When requested by CARRIER, CONTRACTOR may perform extra work not mentioned in Clause 1.0 at terms and conditions acceptable to CONTRACTOR and in accordance with the ILWU/PMA agreements and rules. Although any extra work is normally to be paid for at total man-hour billing rates plus 10% and equipment rental rates and cost of materials, rates can be set for some extra work, if both parties agree.

4.0  LABOR STANDBY, DETENTION, AND DEADTIME

4.1 Any labor standby, detention, and deadtime in vessel stevedoring shall be for account of OWNER or CONTRACTOR, unless such detentions are caused by CARRIER's request with OWNER's authorization.

5.0  COMPENSATION

5.1 PAYMENT

CARRIER SHALL COMPENSATE CONTRACTOR for the performance of the services described herein in accordance with this Agreement and the Schedule(s) of Rates attached hereto and will reimburse CONTRACTOR for charges paid on their behalf. Payments shall be made in U.S. funds within thirty (30) days after receiving relevant invoice at CARRIER's or its agent's office in San Francisco, excluding any amount in dispute accompanied by a written explanation. In the event that late payment occurs, CARRIER agrees to pay interest of outstanding sums at prevailing bank prime rates. Port of Oakland tariff items; such as, wharfage, wharf storage, and demurrage are to be settled per Port of Oakland Tariff rules and regulations.

5.2 RATES

A. The rates specified in the Schedule of Rates shall, unless otherwise provided, cover costs of the following items:

   1. Shoreside container gantry cranes for handling of containers within capacity of cranes, as well as, other equipment required for normal vessel's operation and terminal work for handling of containers.

   2. The cost of longshore, clerk, mechanic labor, and supervision in the yard and at the gate (except for maintenance and repair of CARRIER's equipment). Such cost to include Worker's Compensation, insurance and taxes, all PMA manhour assessments, car fares, as well as, time contractually or customarily guaranteed to personnel on a normal shift. Any services outside of the regular working hours on day shifts (Mondays through Fridays, exclusive of holidays), upon request of CARRIER and acceptance of CONTRACTOR, shall be performed subject to shift differentials in the Schedule of Rates.

   3. All services performed for containers in connection with a normal vessel's operation during the first and second shifts on Mondays through Fridays, exclusive of holidays. Such costs to include workers' compensation, insurance and taxes, all PMA man hour assessments, car fares, as well as, time contractually or customarily guaranteed to personnel on a normal shift. Vessel stevedoring services during overtime first and second shifts, as well as, any third shifts, shall be performed subject to shift differentials in the Schedule of Rates.

   B. The following items are expressly understood to be EXCLUDED from the rates listed in the Schedule of Rates.

T.R.

11.



   1. Wharfage, wharf storage, and demurrage charges to be billed to CARRIER according to the Port of Oakland Tariff. Dockage shall be for account of OWNER.

   2. Pacific Maritime Association tonnage assessments, for which CARRIER will be invoiced by CONTRACTOR. CONTRACTOR will then remit on behalf of CARRIER.

   3. CONTRACTOR's computer services beyond normal terminal operator's functions.

   4. Cargo penalties as assessed.

## 5.3 REVISION OF RATES

All rates for services specified in the Schedule of Rates are based upon and subject to the employment of longshoremen and other labor under the provisions of the agreement in effect at the date of this Agreement with the labor unions involved. In the event of an increase or decrease in the wage scale (including PMA man hour assessments/car fares or changes affecting working contracts/conditions of ILWU/IAM labor), CONTRACTOR shall promptly advise CARRIER of such changes and the rates applicable shall, as a consequence, be revised by mutual agreement.

Such revision shall not be unreasonably withheld.

## 6.0 INDEMNITY

6.1 CONTRACTOR shall be responsible for and shall indemnify CARRIER for loss and/or damage to cargo (subject to provisions contained in Section 6.3 and 6.4 of this agreement), container, equipment, or property of CARRIER arising out of the performance of the services set forth in Section 1 of this Agreement, through its negligence. When such damage occurs to cargo, equipment, or property of CARRIER or where loss or damage occurs to cargo by reason of such negligence, the vessel's officer (or other authorized CARRIER's representative) will make efforts to call this to the attention of CONTRACTOR at the time of its occurrence or at least within 48 hours of its occurrence.

6.2 To the extent permitted by law, CONTRACTOR shall be responsible for and shall indemnify, defend, and hold harmless CARRIER from all liabilities or expenses or defense of claims or suits for loss of and/or damage to property of third persons and for personal injury or death of any person arising out of the negligence of CONTRACTOR under this Agreement. As a sole exception to the above, CARRIER shall not be entitled to such indemnity under this Agreement in the event that the accident or occurrence giving rise to any such claim is caused by the negligent or intentional act of CARRIER, its agents, or employees, or the masters and crew of vessels of OWNER or by the negligent operation or un-seaworthiness of any vessel of OWNER. Each party shall give prompt written notice to the other party of any accident or occurrence in connection with the services, equipment, gear, and operations provided and conducted hereunder which might become the subject of claim or litigation.




6.3 CARRIER shall incorporate in any bills of lading evidencing transportation agreements entered into for the transportation of cargo for which CONTRACTOR's services under this contract are employed, a provision extending to independent stevedoring contractors the benefits and limitations upon liability of CARRIER thereunder, which shall include, but not be limited to, the provisions of the U. S. Carriage of Goods by Sea Act ("COGSA"), incorporated and extended to apply throughout the time during which CONTRACTOR should perform services under this contract. Any waiver or extension by CARRIER of such limitation of liability clauses shall not be effective against CONTRACTOR.

6.4 With respect to any indemnity cause of action by CARRIER against CONTRACTOR arising out of cargo loss or damage caused by CONTRACTOR, there shall be a period of limitations of one year from the time of accrual of such cause of action within which such action must be filed in a court of competent jurisdiction or be forever barred. Moreover, any unilateral waiver of rights or extension of obligations by CARRIER beyond that specified in said transportation agreement, including said COGSA, shall result in the discharge of any obligation of CONTRACTOR to indemnify CARRIER to the extent of such waiver or extension.

6.5 CONTRACTOR will not accept liability for concealed damage or loss or for the condition of contents of containers received in damaged condition from vessel or inland carrier.

## 7.0  INSURANCE

7.1 CONTRACTOR shall maintain, during the term of this Agreement, insurance as follows:

   A. Workmen's Compensation Insurance for the protection of its employees in accordance with the California Compensation Act and the Federal Longshoremen and Harbor Workers Act.

   B. Bodily Injury Public Liability Insurance in the amount of not less than one million dollars ($1,000,000.00) in respect to any one person, and one million dollars ($1,000,000.00) with respect to any one occurrence as protection against injury to or death of any person or persons arising out of the negligence of CONTRACTOR.

   C. Property Damage Insurance in the amount of one million dollars ($1,000,000.00) covering CONTRACTOR's legal liability as protection against loss or damage to CARRIER's property including, but not limited to, CARRIER's containers, chassis, and other equipment arising out of the negligence of CONTRACTOR under this Agreement.

   D. Excess Public Liability and Property Damage Liability Insurance covering all operations in a combined single limit of Ten Million dollars ($10,000,000.00) in addition to primary policies.

7.2 CONTRACTOR shall, upon request, furnish CARRIER with copies of certificates of insurance evidencing such coverage and give a written notice to CARRIER prior to change in or cancellation of such insurance coverage.



13

### 8.0 INDEPENDENT CONTRACTOR

It is hereby understood that CONTRACTOR shall be an independent contractor and not an agent or employee of the CARRIER and all employees or laborers employed in the performance of services under this Agreement shall be employees of CONTRACTOR, or its sub-contractors, at all times, and not of CARRIER.

### 9.0 ASSIGNMENT

No party to this Agreement may assign or transfer this Agreement or all or any part of its rights hereunder to any person, firm, or corporation without prior written consent of the other party.

### 10.0 ARBITRATION

Should any dispute arise between the parties, the matter in dispute shall be referred to three (3) arbitrators in Los Angeles, California. One to be appointed by each of the parties hereto, and the third to be chosen by the two. The arbitrators shall be members of the industry. Their decision shall be final and shall be upheld by the court.

### 11.0 APPLICABLE LAW

The laws of the State of California shall apply to this agreement.

### 12.0 FORCE MAJEURE

Should unusual conditions occur, including without limitation, damage or destruction to premises or facilities (including vessels or containers), by fire, flood, riot, earthquake, tidal wave, windstorm, hail, explosion, force majeure, act of God, the public enemy, or other casualty, or should the operation by CONTRACTOR be suspended, abated, prevented or impaired by reason of war, war-like operations, seizure, marine casualty, governmental decree or regulation, stoppage of public power supply, strikes, or other labor disputes, lockout or other work stoppage or by reason of any other condition beyond the control of CONTRACTOR or vessel, so as to render the terminal wholly or partially untenable or unfit for use, or so as to make it impractical for the vessel or CONTRACTOR to make reasonable or full use thereof, then CONTRACTOR may suspend or reduce services without responsibility for any claim by vessel or others arising out of such service suspension or reduction.

### 13.0 CONTAINMENT OF ENTIRE AGREEMENT HEREIN

This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto and contains all of the covenants and agreements between the parties. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally, or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied herein, and that no other agreement, statement, or promise not contained in this Agreement will be effective excepting a subsequent modification in writing, signed by the party to be charged.

T.R.

### 14.0 ATTORNEY'S FEES AND COSTS

If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which he may be entitled.

### 15.0 PARTIAL INVALIDITY

If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in force without being impaired or invalidated in any way.

### 16.0 TERM OF THIS AGREEMENT

This Agreement shall be effective from the date of this Agreement and shall terminate at any time if and when Space Charter and Operation Agreement between CARRIER and OWNER is terminated.

### 17.0 COMPLETION

Notwithstanding any termination or cancellation of this agreement, CONTRACTOR shall at the option of CARRIER continue to be responsible for the completion of any vessel stevedoring and container yard/gate activities which CONTRACTOR is performing on the effective date of such termination or cancellation and CONTRACTOR will receive payment for these services as specified in this Agreement.

### 18.0 MODIFICATIONS

This Agreement may be amended, modified, or supplemented at any time by mutual consent in writing between the parties.

### 19.0 NOTICES

Any and all notices required by this Agreement shall be given by addressing said notices to the other party at its address designated below and by depositing said notices in the U. S. Post Office as Registered or Certified Mail, with postage prepaid. When so given, such notice shall be effective from the date of receipt or 72 hours after being mailed. Unless subsequently changed by notice in writing, the address of CONTRACTOR shall be:

> TransBay Container Terminal, Inc.
> 707 Ferry Street
> Oakland, California  94607-1003

and the address of CARRIER shall be:

> Yang Ming Marine Transport Corporation
> c/o Solar International Shipping, Inc.
> 525 Washington Blvd., 25th Floor
> Jersey City, NJ  07310



15.



IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective representative thereto duly authorized, on the date and year first above written, in two originals.

Solar International Shipping Agency
Inc. as General Agent
CARRIER

BY: _____

TITLE: Vice President

DATE: Jan. 30, 1996

CONTRACTOR

BY: _____

TITLE: SENIOR VICE PRESIDENT

DATE: Jan. 16, 1996