UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
NIPPON EXPRESS U.S.A. (ILLINOIS), INC.,

                Plaintiff,

         -against-

06 Civ. 694 (PKC)

MEMORANDUM
AND ORDER

M/V CHANG JIANG BRIDGE and YANG
MING MARINE TRANSPORT
CORPORATION,

                Defendants.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Plaintiff Nippon Express U.S.A. (Illinois), Inc. ("Nippon Express") alleges that it hired defendants Yang Ming Marine Transport Corp. ("Yang Ming") and M/V Chang Jiang Bridge ("Vessel") to transport 8,400 ink toner cartridges (the "Shipment") from Oakland, California to Tokyo, Japan. Plaintiff further alleges that the Shipment was not properly cared for during transport, causing it to suffer damage in excess of $500,000. Plaintiff's complaint, which was filed on January 30, 2006, seeks damages for breach of contract and negligence and also seeks indemnification and contribution. Defendant Yang Ming's answer asserts several affirmative defenses and the existence of a mandatory London forum selection clause in the bill of lading issued to Nippon Express by Yang Ming. Yang Ming now moves to dismiss Nippon Express's complaint against it based on the forum selection clause.

        In opposition, Nippon Express contends that the bill of lading containing the London forum selection clause has been superseded by a stevedore contract which

calls for disputes to be addressed through arbitration in Los Angeles, California. For the reasons discussed below, defendant's motion will be granted and the complaint will be dismissed as to Yang Ming.

I.     Factual Background

In September 2004, Nippon Express, a non-vessel operating common carrier (also known as an intermediate cargo carrier), was hired by non-party Canon USA, Inc. ("Canon") to transport the Shipment from Oakland, California to Tokyo, Japan. Nippon Express, in turn, hired Yang Ming to do the actual transpacific shipping. On September 25, 2004, Yang Ming issued bill of lading # YMLUW160067969 ("Bill of Lading") to Nippon Express covering "8,400 CTNS" of printer cartridges "on 200 pallets." (Maloof Decl., Exh. A.) The total value of the Shipment exceeded $1 million.

After the cartridges were shipped to the TransBay Container Terminal ("Terminal") in Oakland, but before the Shipment began its ocean voyage, Nippon Express was notified by Canon that because temperatures inside shipping containers can exceed 140 degrees Fahrenheit during transpacific voyages, the Shipment should be refrigerated during its journey to Japan lest it suffer heat damage. On September 23, 2004, Nippon Express sent an "urgent" request to Yang Ming to "dray off" or remove the Shipment from the other cargoes being loaded so that proper refrigerated containers could be used. (Id., Exh. C.) Yang Ming informed the Terminal of the "dray-off" order, yet, due to an oversight, the Shipment was not separated from the rest of the cargoes and the Terminal placed the Shipment into five unrefrigerated containers, four of which were positioned in the top row of containers on the Vessel's deck and exposed to direct sunlight during transport. (Id., Exh. D.) Shortly after the Vessel set sail for Japan, Yang

Ming emailed Nippon Express and stated that due to "our terminal's negligence" the dray-off order was not followed. (Id., Exh. F.)

When the Shipment arrived in Japan, a sample of the cartridges was tested by a licensed Japanese cargo surveyor. The test revealed that there had been a deterioration of ink quality in the black-ink cartridges. (Id., Exh. D.) The surveyor concluded that the cause of the deterioration was excessive heat during transport and noted that black ink is more sensitive to heat than other ink colors, undergoing chemical change at 40 degrees Celsius (104 degrees Fahrenheit). (Id.) All 4,620 black ink cartridges in the Shipment were deemed irreparable and of no value.

Canon looked to its insurer, non-party Sompo Japan Insurance Co. ("Sompo"), to pay for the damage done to the Shipment and, in June 2006, Canon received ¥60,618,321 (approximately $525,000) from Sompo to cover the loss. (Id., Exh. E.) Nippon Express, anticipating a claim against it by Sompo as Canon's subrogee, filed the instant action against Yang Ming and the Vessel "primarily to protect [against] a potential time bar." (3/9/06 Endorsed Ltr., Docket #7.)

In May 2006, Nippon Express made an application to this Court to place the action on the Court's suspense docket for six months because no lawsuit had yet been filed against Nippon Express and it hoped that "this protective lawsuit for indemnity and filed as a precaution" could be withdrawn or amicably resolved. (5/24/06 Endorsed Ltr., Docket # 8.) Nippon Express's application was granted and the matter was placed on the suspense docket, subject to dismissal if it was not restored to the active calendar by November 30, 2006. In late November 2006, Nippon Express requested that the matter remain on the suspense docket until May 30, 2007 because it was in the process of

"negotiating with Japanese interests to resolve the underlying cargo claim." (11/27/06 Endorsed Ltr., Docket # 9.) Again, the Court granted Nippon Express's application. (Id.)

In December 2006, Nippon Express's insurer, non-party NipponKoa, settled with Sompo for $55,000 and Sompo assigned to NipponKoa all remaining claims it had related to the damaged Shipment. (Maloof Decl., Exh. G.) Four months later, Nippon Express notified the Court that it had "resolved its underlying cargo claim with Japanese interests" and requested that the matter be placed on the Court's active calendar. (4/27/07 Endorsed Ltr., Docket # 10.) The case was reinstated to the active calendar on April 26, 2007. (Id.) Thereafter, Nippon Express requested permission to move the Court to substitute as plaintiff its insurer, NipponKoa. Yang Ming, thereafter, made the instant motion to dismiss on the basis of the London forum selection clause. Pending the outcome of this motion, the Court preserved plaintiff's substitution motion and defendant's right to move for a transfer of venue to California. (5/11/07 Minute Entry.)

On June 1, 2007, Nippon Express made an application for a two-week extension to file its opposition to Yang Ming's motion to dismiss because, among other reasons, it "learned that there is more than one contract of carriage which may be implicated by the claims at issue" and it was "still attempting to understand the implications of that contract." (6/4/07 Endorsed Ltr., Docket 16.) Nippon Express's application for an extension was granted and its opposition papers were filed on June 12, 2007. Yang Ming filed its reply papers on June 19, 2007 and Nippon Express submitted a sur-reply on June 22, 2007. On July 5, 2007, Yang Ming filed a rejoinder memorandum in response to Nippon Express's sur-reply. On November 20, 2007, the Court was informed by the parties that the wrong stevedore contract had been produced

during discovery by Yang Ming.  (11/20/07 Endorsed Ltrs., Docket 23, 24.)  The correct stevedore contract was produced by Yang Ming and filed by Nippon Express on November 28, 2007.  (2d Maloof Decl., Docket 25.)

II.   Discussion

   A. Legal Standards

Yang Ming fails to state the procedural rule under which it makes its motion to dismiss.  That omission is not surprising since there is no Federal Rule of Civil Procedure tailored to address the enforcement of a forum selection clause.  See New Moon Shipping Co. v. Man B&W Diesel AG, 121 F.3d 24, 29 (2d Cir. 1997) ("[T]here is no existing mechanism with which forum selection enforcement is a perfect fit.") (citation omitted).  Neither the Supreme Court nor the Second Circuit has "designated a single clause of Rule 12(b) as the 'proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause . . . .'"  Asoma Corp. v. SK Shipping Co., 467 F.3d 817, 822 (2d Cir. 2006) (quoting New Moon, 121 F.3d at 28).  Courts in this Circuit appear to prefer Rule 12(b)(3) as the procedural device used to enforce a forum selection clause.  See Zurich Ins. Co. v. Prime, Inc., 419 F. Supp. 2d 384, 386 (S.D.N.Y. 2005) ("[C]ourts of this circuit have made clear that courts do possess the ability under either Rule 12(b)(3) or § 1406(a) to dismiss a case upon a motion that a forum selection clause renders venue in a particular court improper.") (citations omitted).  I therefore deem the instant motion made pursuant to Rule 12(b)(3) because, among other reasons, that rule "allows courts to consider materials [such as a contractual forum selection clause] outside the pleadings."  Jockey Int'l Inc. v. M/V Leverkusen Express, 217 F. Supp. 2d 447, 450 (S.D.N.Y. 2002).

In deciding a motion to dismiss based on a forum selection clause, the plaintiff is entitled to "have the facts viewed in the light most favorable to it" and to be heard before any disputed facts are resolved against it. New Moon, 121 F.3d at 29. The plaintiff bears the burden of overcoming a presumption of the forum selection clause's enforceability. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972) (forum selection clauses are prima facie valid unless enforcement is shown by resisting party to be unreasonable under the circumstances). The Second Circuit has endorsed a four-part analysis to determine whether to dismiss a claim based upon the existence of a valid forum selection clause. See Phillips v. Audio Active Ltd., 494 F.3d 378, 383-84 (2d Cir. 2007). The court first considers whether "the clause was reasonably communicated to the party resisting enforcement" Id. (citation omitted). Second, the court considers whether the clause is mandatory. Id. (citation omitted). Third, it considers whether the claims and parties are subject to the clause. Id. (citation omitted). In the fourth and final step, the court determines "whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" Id. (quoting M/S Bremen, 407 U.S. at 15).

B. Facts Applied to Law

The forum selection clause at issue states as follows:

> Except as otherwise provided specifically herein any claim or dispute arising under the Bill of Lading shall be governed by the laws of England and determined in English courts sitting in the city of London to the exclusion of the jurisdiction of the courts of any other place. In the event this clause is inapplicable under local law, then jurisdiction and choice of law shall lie either in the port of loading or port of discharge at Carrier's option.

(Bill of Lading, § 26.)  Here, there is no dispute with respect to the first two prongs of the four-part test.  As to the first prong, the forum selection clause was printed on the Bill of Lading issued by Yang Ming to Nippon Express and thus was reasonably communicated.  As to the second prong, the clause is mandatory by virtue of its use of the word "shall" and because London jurisdiction is to "the exclusion of . . . any other place."  See John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distribs. Inc., 22 F.3d 51, 52-53 (2d Cir. 1994) (forum selection clause mandatory when venue and jurisdiction specified with exclusive or mandatory language).

The third prong—whether the claims and parties are subject to the clause—is contested.  Because the dispute involves a question of law, i.e. whether Nippon Express's claims and the parties are subject to the clause, no hearing is required.  See New Moon, 121 F.3d at 29.  Nippon Express argues that the claims and parties are not subject to the Bill of Lading's forum selection clause because another provision of the Bill of Lading has been implicated that directs the terms and conditions of an underlying carrier contract to be incorporated into the Bill of Lading.  The Bill of Lading provision that Nippon Express relies upon states in relevant part:

> Notwithstanding the foregoing, in the event there is a private contract of Carriage between the Carrier and any Underlying Carrier, such Mulitmodal Transportation will be governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length . . . .

(Bill of Lading, Section 7(B)(2).)

Nippon Express asserts that the stevedores selected by Yang Ming to load and unload cargo are "[u]nderlying [c]arrier[s]."  It argues that the terms of the contract between Yang Ming and non-party TransBay Container Terminal Inc ("TransBay"), the stevedoring company that loaded the Shipment onto the Vessel, has superseded the terms

of the Bill of Lading issued to Nippon Express by Yang Ming. The stevedore contract between Yang Ming and TransBay (the "Stevedore Contract") is entitled "Container Stevedoring and Service Agreement" and provides that disputes are to be governed by California law and are to be arbitrated in California. (Stevedore Contract, §§ 10-11.) Yang Ming argues that the Stevedore Contract has not been incorporated into the Bill of Lading because that contract is not "a private contract of Carriage between the Carrier and an[] Underlying Carrier" as defined by the Bill of Lading. A stevedore is not an underlying carrier, Yang Ming contends, because carriers transport passengers or property while stevedores move cargo around port terminals and onto vessels. Nippon Express espouses a much broader view of who is to be considered an underlying carrier under the Bill of Lading and takes the position that any subcontractor engaged in any aspect of the transportation of the shipment is an underlying carrier as that term is defined in the Bill of Lading.

  As an initial matter, I note that the complaint pleads breach of the Bill of Lading and makes no mention of a stevedoring contract. In fact, the only other contract specifically mentioned in the complaint is the waybill issued by Nippon Express to Canon, the owner of the Shipment. Nevertheless, I will address the merits of Nippon Express's contractual arguments.

  As the parties have framed the issue, if TransBay, acting as stevedore, is an "[u]nderlying [c]arrier" pursuant to the Bill of Lading, then the Stevedore Contract's terms and conditions govern and the London forum selection clause is inapplicable. If TransBay is not an "[u]nderlying [c]arrier" pursuant to the Bill of Lading, then the claims and the parties are subject to the mandatory and exclusive London forum selection clause

and the third prong of the Second Circuit's test has been satisfied; i.e. the claims and the parties are subject to the clause.  See Phillips, 494 F.3d at 383.  For the reasons that follow, I conclude that the Stevedore Contract between Yang Ming and TransBay is not a "private contract of carriage between the carrier and any Underlying Carrier" and has not been incorporated into the Bill of Lading pursuant to its section 7(B)(2).  Thus, the exclusive forum selection clause requiring disputes under the Bill of Lading to be heard by English courts sitting in London is applicable.

"Underlying Carrier" is defined in the Bill of Lading as "Any water, rail, motor, air or other carrier utilized by the Carrier for any part of the transportation of the shipment covered by this Bill of Lading."  (Bill of Lading, § 1.)  The Bill of Lading does not define "stevedore" and, in fact, it appears that contextual definitions of that term are rare.  The Oxford English Dictionary defines it as "[a] workman employed either as overseer or labourer in loading and unloading the cargoes of merchant vessels."  Oxford English Dictionary (2d ed. 1989).  This definition comports with the meaning ascribed by case law and legislation.  For example, as noted by the Eighth Circuit, "the term 'stevedore' and longshoreman' seem to be used interchangeabley [by the Supreme Court] . . . Webster's Dictionary defines both 'stevedore' and longshoreman' as workers who load and unload vessels."  Reed v. ULS Corp., 178 F.3d 988, 991 n.3 (8th Cir. 1999) (citing Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 156-57 (1981)).  The Waterfront Commission Compact between the States of New York and New Jersey defines "stevedore" as "a contractor (not including an employee) engaged for compensation pursuant to a contract or arrangement with a carrier of freight by water, in moving waterborne freight carried or consigned for carriage by such carrier on vessels of

such carrier berthed at piers, on piers at wich such vessels are berthed or at other waterfront terminals." N.J. Stat. Ann. § 32:23-6. The Third Circuit has interpreted this definition to describe "contractors who provide loading services for others." <u>Waterfront Com'n of New York Harbor v. Elizabeth-Newark Shipping, Inc.</u>, 164 F.3d 177, 185 (3d Cir. 1998). Although stevedores presumably "transport" cargo on and off ships and to and from nearby terminal holding facilities or trucks, the element of "transportation" is <u>de minimus</u> and incidental to the stevedore's main function of loading and unloading vessels. <u>See</u> <u>Nippon Fire & Marine Ins. Co. v. Skyway Freight Systems, Inc.</u>, 235 F.3d 53, 60 (2d Cir. 2000) ("[T]he fact that an air carrier temporarily may have stored the goods does not render the carrier a warehouseman, subject to common law warehouseman's duties, so long as the storage was only temporary and incidental to the primary goal of interstate shipment.") (citation omitted).

Nippon Express places great weight on the phrase "for any part of the transportation" found in the definition of "[u]nderlying [c]arrier" and invites the Court to adopt its conclusion that stevedores are "[u]nderlaying [c]arrier[s]" because "moving cargo around a terminal and onto vessels is a critical part of the transportation." (Pl. Mem. at 6.) However, even if the stevedore's moving of cargo is part of the transportation, stevedores must first be carriers before they can be deemed "[u]nderlying [c]arriers" because the definition is limited to "water, rail, motor, air or other <u>carrier[s]</u>" who provide part of the transportation. (Bill of Lading, § 1(l) (emphasis added).)

The Bill of Lading's definition of "Carrier" is limited to "Yangming Marine Transport Corporation" and is therefore unhelpful. (Bill of Lading, § 1(b).) The United States Carriage of Goods Act ("COGSA"), however, defines it as "the owner

manager, charters or master of a vessel [which] includes the owner or the charterer who enters into a contract of carriage with a shipper." 46 U.S.C. § 30701. Nothing in that definition indicates an intent to include stevedores and, indeed, case law makes clear that stevedores are not covered by this definition. See De Laval Trubine, Inc. v. West India Industries, Inc., 502 F.2d 259, 264 (2d Cir. 1974) ("The term 'carrier' . . . is defined as including 'the owner or charterer who enters into a contract of carriage with a shipper. . . . stevedores and agents do not fit within this definition. . . .") (citing Robert C. Herd & Co., Inc. v. Krawill Machinery Corp., 359 U.S. 297, 302 (1959)); accord Generali v. D'Amico, 766 F.2d 485, 487 (11th Cir. 1985).

Stevedores do not contract to transport passengers or goods. They contract to load and unload ship cargoes and are therefore not carriers as that term is understood, both generally and in the technical context of admiralty. Had the defined term "Underlying Carrier" been meant to include stevedores under the Bill of Lading, then, at minimum, the definition would have included references to subcontractors of carriers. See Cabot Corp. v. S.S. Mormacscan, 441 F.2d 476, 478-79 (2d Cir. 1971) ("[A]n intention to extend benefits of [a Himalaya clause] to the stevedore would most naturally have been expressed by the addition of the term 'stevedore' to the long list of various persons under the definition of 'carrier . . . .'") (citations omitted). As defined by the Bill of Lading, "'Subcontractor' includes owners and operators of Vessels (other than the Carrier), slot chartered owners, stevedores, terminal and group age operators, Underlying Carriers and any independent contractor employed by the Carrier in the performance of the Carrier." (Bill of Lading, § 1(k) (emphasis added).) It is significant that the Bill of Lading separately lists "stevedores" and "Underlying Carriers" in the

single definition of "Subcontractors" because it indicates an intent to ascribe a separate and distinct meaning to those two words. Moreover, it shows that the contracting parties knew how to include stevedores when such inclusion was intended.

I will now address the fourth and final prong of the Second Circuit test, "whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." Phillips 494 F.3d at 383-84 (citation and internal quotation marks omitted). Nippon Express does not argue that enforcement of the clause "would be unreasonable or unjust" or that the clause is invalid due to "fraud or overreaching." Id. In a footnote, however, it notes that there are no witnesses or documents in the United Kingdom and that the claims "are now almost certainly time-barred there." (Pl. Mem. at 7.) That a claim may be time-barred in a foreign jurisdiction should not dictate the result of motion to dismiss an action based on the existence of a valid forum selection clause. See New Moon, 121 F.3d at 33 ("[C]onsideration of a statute of limitations [in deciding a motion to dismiss on the basis of a forum selection clause] would create a large loophole for the party seeking to avoid enforcement of the forum selection clause. That party could simply postpone its cause of action until the statue of limitations has run in the chosen forum and then file its action in a more convenient forum."); American Home Assur. Co. v. M/V Jaami, 06 Civ. 287 (LBS), 2007 WL 1040347, *3 (S.D.N.Y. April 4, 2007) ("Courts in this district have held repeatedly that a time bar in a foreign jurisdiction is not a basis for invalidating a forum selection clause.") (citations omitted).

Here, Nippon Express had notice of the forum selection clause well prior to bringing suit in New York, thus there is no reason to depart from the usual rule. See LPR, SRL v. Challenger Overseas, LLC., 99 Civ. 8883 (JGK), 2000 WL 973748 at *7 (S.D.N.Y. July 13, 2000) (granting motion to dismiss on basis of mandatory forum selection clause despite plaintiff's contention of prejudice because its action was time-barred in Italy leaving it without a forum). As noted by Judge Koeltl, "[t]here is no reason to depart from this usual rule in this case because the plaintiff had sufficient notice of the forum selection clause. It chose to bring the action in this Court in the face of a clear forum selection clause." Id. In addition, Nippon Express's passing mention that no witnesses or documents are located in the United Kingdom does not rise to the level of a "clear showing" that enforcing the clause would be unreasonable or unjust. See Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1363-65 (2d Cir. 1993).

As an alternative argument, Nippon Express contends the Bill of Lading is ambiguous with respect to choice of law and choice of forum. First, it argues there is ambiguity because the Bill of Lading provides that the rights and obligations of the parties with regard to cargo damage shall be governed by COGSA while, at the same time, providing for English law to apply. Section 7(A)(2) of the Bill of Lading states: "Notwithstanding anything contained in the preceding provision, in the event that this Bill of Lading covers shipments to or from the United States, than [sic] . . . COGSA shall be compulsorily applicable . . . ." That provision and the English choice of law provision, however, are not mutually exclusive and create no ambiguity because the choice of law provision makes clear that English law applies to disputes under the Bill of Lading "[e]xcept as otherwise specifically provided herein . . ." (Bill of Lading, ¶ 26.)

This means English law applies to the extent it is not specifically displaced by other Bill of Lading provisions, such as the one requiring U.S. COGSA to apply in the context of cargo damage or loss.  See M/V Jaami, 2007 WL 1040347 at *2 (bill of lading not ambiguous even though forum selection and choice of law clause provide for Japanese law "except as otherwise provided herein" while another provision requires application of COGSA).

Nippon Express also points to section 7(E) of the Bill of Lading which states: "In the event the Carriage covered by this Bill of Lading is subject to two or more compulsory national laws, then the national law of the jurisdiction in which any action is brought shall be applicable."  (Bill of Lading, § 7(E).)  Nippon Express contends this creates ambiguity because it attempts to ensure that any forum selected will only be interpreting its country's own law in contradiction to the mandatory London forum selection clause and the call for U.S. COGSA to apply to cargo loss or damage.  Under these facts, however, section 7(E) is not even implicated as the Bill of Lading is not subject to two compulsory national laws.  The English counterpart of COGSA (known as the "Hague-Visby Rules") is likely inapplicable because it is compulsory only where the port where the shipment was loaded or the place where the Bill of Lading was issued is in a country that has adopted the Hague-Visby Rule, or where the Bill of Lading chooses the Hague-Visby Rules as the law governing cargo damage or loss.  See The Carriage of Goods by Sea Act 1971 [of England] (1971 c. 19 at 1-2) available at http://www.opsi.gov.uk/acts/acts1971/pdf/ukpga_19710019_en.pdf.  Thus, the conditions requiring compulsory application of Hague-Visby Rules are seemingly lacking where the cargo was loaded in the United States and the Bill of Lading specifically deems U.S.

COGSA applies to cargo claims. I note here that there is no reason to doubt the ability of English courts to apply U.S. COGSA because the Hague-Visby Rules are substantially similar to U.S. COGSA. See Reed & Barton Corp. v. M.V. Tokio Exp., 98 Civ. 1079 (LAP), 1999 WL 92608, *3 (S.D.N.Y. Feb. 22, 1999) (noting Hague-Visby Rules are "fraternal equivalent" of U.S. COGSA). Moreover, "[n]othing [in COGSA] . . . suggests that the statute prevents the parties from agreeing to enforce [the rights and duties imposed by COGSA] in a particular forum." Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 535 (1995). Nippon Express's ambiguity arguments are without merit.

III.   Conclusion

For all the foregoing reasons, Yang Ming's motion to dismiss is granted.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       December 13, 2007